# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**ROXANNE WIELAND,**

    **Plaintiff,**

   v.                                                  **Case No. 19-CV-1066-SCD**

**ANDREW M. SAUL,**
**Commissioner of Social Security,**

    **Defendant.**

---

## DECISION AND ORDER

---

Roxanne Wieland alleges that she is unable to work due to severe pain, chronic fatigue, and mental-health impairments. After the Social Security Administration (SSA) denied her application for disability benefits, Wieland requested and received a hearing before an ALJ. The ALJ determined that Wieland remained capable of working notwithstanding her impairments. Wieland now seeks judicial review of that decision.

Wieland argues that the ALJ erroneously discounted her subjective complaints concerning the limiting effects of her impairments, improperly rejected the opinions of her treating sources, and failed to include certain functional limitations in the residual functional capacity (RFC) assessment. The Commissioner contends that the ALJ's decision is supported by substantial evidence. The court largely agrees with Wieland. Because the ALJ failed to provide sufficient reasons for not believing Wieland's subjective complaints of disabling physical symptoms and for not crediting the opinions of her medical providers, the decision denying Social Security benefits to Wieland will be reversed and this matter will be remanded for further proceedings.

# BACKGROUND

Wieland was born on January 11, 1976, in Green Bay, Wisconsin. R. 340.[1] She dropped out of high school during her junior year and obtained her high school equivalency degree a few months later. After leaving high school, Wieland worked in various unskilled jobs. R. 340–41. In 2000, she was hired as a receptionist for Winnebago County. R. 341. Wieland worked her way up to a case manager, where she helped determine applicants' eligibility for public assistance programs. R. 264–65, 341.

Around 2010, Wieland began using a lot of vacation and sick time to cover absences related to several physical and mental ailments. R. 46. She experienced severe pain throughout her entire body, and her legs swelled up so much that she could barely walk to her car at the end of the workday. From November 2011 until January 2012, Wieland took off one to two hours each day to move around, rest, and elevate her legs. R. 46, 50–51. She also missed about three to four days of work each month because of her health problems. R. 51. When at work, her medications caused her to fall asleep on the job, and clients complained about her slurred speech, believing she was intoxicated. R. 46, 51–52. Given her medical issues, Wieland qualified for long-term disability benefits through Wisconsin's pension program for state employees. R. 50, 341. She stopped working for Winnebago County on January 27, 2012. R. 229, 341. Several months later, the pension program approved Wieland for permanent disability. R. 254, 341.

In May 2012, Wieland applied for disability insurance benefits from the Social Security Administration. R. 96. An administrative law judge denied her claim on November 19, 2014. R. 331. Wieland reapplied for benefits in September 2016, alleging that she became disabled

---

[1] The transcript is filed on the docket at ECF No. 9-2 to ECF No. 9-25.

on January 27, 2012, her last day of work. R. 197–203. Wieland asserted that she was unable to work due to osteoarthritis, lumbar spondylosis, fibromyalgia, major depression, anxiety, diabetes, chronic pain, neuropathy, edema, and sleep apnea. R. 229. After the SSA denied her application initially, R. 94–107, and upon reconsideration, R. 108–24, Wieland requested a hearing before an ALJ, R. 152–53. The SSA granted Wieland's request. R. 125–39. Prior to the hearing, Wieland amended her alleged onset date to November 20, 2014, the day after the first ALJ's unfavorable decision. R. 331.

On July 9, 2018, Wieland appeared before ALJ Patrick Berigan for her administrative hearing. R. 33–65. She was represented by an attorney. R. 37. At the time of the hearing, Wieland was forty-two years old. R. 41. She was 5'5" tall and weighed 350 pounds. R. 53. And she was living in a house with her husband and two sons, ages fifteen months and fourteen. R. 41.

Wieland testified that the main problems keeping her from working were pain, depression, and exhaustion. R. 44. She testified to having pain throughout her entire body, which was especially pronounced in her lower neck, lower back, feet, hands, wrists, and fingers. R. 44, 52–53. According to Wieland, her condition had worsened since 2014. R. 45. Her sleep was disrupted, R. 45, 54–55, she felt more depressed and anxious, R. 55, and she began using plastic dishes because she was frequently dropping things, R. 58. She was prescribed several different medications, but they provided only limited relief and caused significant side effects. R. 47–48, 54.

Wieland testified that she spent about four to five hours lying down during the day and that she elevated her legs for thirty to sixty minutes at a time to reduce the swelling in her legs. R. 53–54, 56–57. She testified that her husband and teenage son took care of most household

duties, including caring for their toddler. R. 45–46, 57–58. Wieland tried to help fold laundry, but she needed frequent breaks and was unable to reach the top shelf where the towels were kept. R. 58. Wieland estimated that she could sit for fifteen to thirty minutes before needing to get up and move around and that she could stand for about five minutes, maybe ten if leaning against something. R. 48–49. She indicated that sometimes she could not lift a gallon of milk and that she did not carry around her toddler. R. 49–50. Wieland also testified to having problems with attention and concentration. R. 56.

The ALJ also heard testimony from Jacquelyn Wenkman, a vocational expert (VE). According to Wenkman, Wieland's job with Winnebago County was an unskilled, sedentary position. R. 60. Wenkman testified that a hypothetical person with Wieland's age, education, and work experience could not perform that job if she were restricted to sedentary work with additional nonexertional limitations. R. 61. However, that person could perform other jobs, including, for example: office helper, contact assembly, and sorter. R. 61–62. Wenkman testified that a person could be off task up to fifteen percent of the workday and could miss one or two days of work each month (as long as it wasn't every month) and still maintain competitive employment. R. 62. Upon questioning by Wieland's attorney, Wenkman testified that the above jobs would not tolerate unscheduled breaks, lying down during the workday, or elevating legs at or above heart level. R. 63. Also, a person could not perform those jobs if she was limited to occasional bilateral handling and fingering. R. 64.

On November 14, 2018, the ALJ issued a decision applying the five-step evaluation process, *see* 20 C.F.R. § 404.1520(a)(4), that was unfavorable to Wieland. R. 10–32. The ALJ determined that Wieland had not engaged in substantial gainful activity during the period from her amended alleged onset date (November 20, 2014) through her date last insured

4

(December 31, 2017); Wieland suffered from five "severe" impairments: fibromyalgia, morbid obesity, depression, anxiety, and bilateral calcaneal spurs; Wieland did not suffer from an impairment or combination of impairments that met or medically equaled the severity of a presumptively disabling impairment; Wieland had the residual functional capacity to perform a restricted range of sedentary work; Wieland was unable to perform any past relevant work; and other jobs existed in significant numbers in the national economy that Wieland could perform. R. 15–26. Based on those findings, the ALJ concluded that Wieland was not disabled. R. 26.

Thereafter, Wieland requested review of the ALJ's decision by the SSA's Appeals Council. Tr. R. 196. On June 24, 2019, the Appeals Council denied Wieland's request for review, R. 1–6, making the ALJ's decision the final decision of the Commissioner of Social Security, *see Loveless v. Colvin*, 810 F.3d 502, 506 (7th Cir. 2016).

Wieland filed this action on July 25, 2019, seeking judicial review of the Commissioner's decision under 42 U.S.C. § 405(g). ECF No. 1. The matter was assigned to this court in April 2020. All parties have consented to magistrate-judge jurisdiction. *See* ECF Nos. 16, 17 (citing 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b)). The matter is now fully briefed and ready for disposition. *See* ECF No. 10, 14, 15.

## APPLICABLE LEGAL STANDARDS

"Judicial review of Administration decisions under the Social Security Act is governed by 42 U.S.C. § 405(g)." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010)). Pursuant to sentence four of § 405(g), federal courts have the power to affirm, reverse, or modify the Commissioner's decision, with or without remanding the matter for a rehearing.

5

Section 205(g) of the Act limits the scope of judicial review of the Commissioner's final decision. *See* § 405(g). As such, the Commissioner's findings of fact shall be conclusive if they are supported by "substantial evidence." *See* § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (other citations omitted). The ALJ's decision must be affirmed if it is supported by substantial evidence, "even if an alternative position is also supported by substantial evidence." *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004) (citing *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992)).

Conversely, the ALJ's decision must be reversed "[i]f the evidence does not support the conclusion," *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (citing *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003)), and reviewing courts must remand "[a] decision that lacks adequate discussion of the issues," *Moore*, 743 F.3d at 1121 (citations omitted). Reversal also is warranted "if the ALJ committed an error of law or if the ALJ based the decision on serious factual mistakes or omissions," regardless of whether the decision is otherwise supported by substantial evidence. *Beardsley*, 758 F.3d at 837 (citations omitted). An ALJ commits an error of law if his decision "fails to comply with the Commissioner's regulations and rulings." *Brown v. Barnhart*, 298 F. Supp. 2d 773, 779 (E.D. Wis. 2004) (citing *Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir. 1991)). Reversal is not required, however, if the error is harmless. *See, e.g.*, *Farrell v. Astrue*, 692 F.3d 767, 773 (7th Cir. 2012); *see also Keys v. Barnhart*, 347 F.3d 990, 994–95 (7th Cir. 2003) (citations omitted).

In reviewing the record, this court "may not re-weigh the evidence or substitute its judgment for that of the ALJ." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing

*Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Rather, reviewing courts must determine whether the ALJ built an "accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley*, 758 F.3d at 837 (citing *Blakes*, 331 F.3d at 569; *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)). Judicial review is limited to the rationales offered by the ALJ. *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## ANALYSIS

Wieland contends that the ALJ erred in (1) evaluating the intensity, persistence, and limiting effects of her alleged symptoms; (2) assigning little weight to the opinions of her treating sources; and (3) failing to account for all her limitations in the RFC assessment.

### I. Symptom evaluation

ALJs use a two-step process for evaluating a claimant's symptoms. Social Security Ruling (SSR) 16-3p, 2016 LEXIS 4, at *3 (Mar. 16, 2016). First, the ALJ must "determine whether the individual has a medically determinable impairment (MDI) that could reasonably be expected to produce the individual's alleged symptoms." *Id.* at *5. Second, the ALJ must "evaluate the intensity and persistence of an individual's symptoms such as pain and determine the extent to which an individual's symptoms limit his or her ability to perform work-related activities." *Id.* at *9.

Reviewing courts "will overturn an ALJ's decision to discredit a claimant's alleged symptoms only if the decision is 'patently wrong,' meaning it lacks explanation or support." *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017) (quoting *Murphy v. Colvin*, 759 F.3d 811,

7

816 (7th Cir. 2014)). "A credibility determination lacks support when it relies on inferences that are not logically based on specific findings and evidence." *Id.* "In drawing its conclusions, the ALJ must 'explain her decision in such a way that allows [a reviewing court] to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record." *Murphy*, 759 F.3d at 816 (quoting *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011)).

The ALJ here concluded that Wieland's medically determinable impairments could reasonably be expected to cause her alleged symptoms but found that Wieland's statements concerning the intensity, persistence, and limiting effects of those symptoms were "not entirely consistent with the medical evidence and other evidence in the record." R. 21. With respect to Wieland's physical condition, the ALJ found that Wieland had "a history of routine, conservative treatment that is inconsistent with the degree of limitation alleged," that "no physician has recommended or anticipated aggressive treatment like surgery or injections for any of the claimant's severe impairments," and that "there is no evidence of considerable adverse [medication] side effects in the medical evidence of record." R. 21. The ALJ further found that the objective medical evidence did not support the level of Wieland's claimed pain. R. 21–22. As to Wieland's mental functioning, the ALJ determined that "she has not sought significant treatment for [depression or anxiety]," "[s]he has primarily treated her mental health issues with medication," and "mental status examinations overwhelmingly yielded unremarkable findings." R. 23.

### A. Physical symptoms

With respect to her physical symptoms, Wieland contends that the ALJ's reliance on lack of objective findings was erroneous because her main impairment—fibromyalgia—is not

likely to result in such findings. ECF No. 10 at 5–6. Likewise, she faults the ALJ for relying on her "conservative" course of treatment, because no providers had suggested that fibromyalgia is treatable by the "aggressive" methods (i.e., surgery or injections) the ALJ suggested.

The ALJ erred in rejecting Wieland's complaints of disabling physical symptoms. The ALJ inferred, based on Wieland's "routine, conservative treatment," that her symptoms could not have been as disabling as she alleged. This inference is not logically based on the record. Although it is true that Wieland was treated primarily with medication and physical therapy, the ALJ provides no basis for believing that Wieland's fibromyalgia could have been treated with more "aggressive" methods. No medical provider ever suggested a course of treatment that Wieland refused to consider or try. Indeed, Wieland's primary care physician indicated that her pain symptoms had been "recalcitrant to treatment." R. 400. Wieland's course of treatment therefore was of little value in evaluating her physical symptoms.

The ALJ's other reasons for disbelieving Wieland's alleged disabling physical symptoms are problematic as well. The ALJ noted that, "aside from trigger points, there are no objective findings to explain [Wieland's] severe pain." R. 22. According to the Seventh Circuit, however, "[t]here are no laboratory tests for the presence or severity of fibromyalgia." *Sarchet*, 78 F.3d at 306. Consequently, "[w]hen a claimant has fibromyalgia, it is inappropriate for an ALJ to reject her claims of pain because they are not verified by traditional medical tests." *Alexander v. Barnhart*, 287 F. Supp. 2d 944, 965 (E.D. Wis. 2003). The ALJ also erroneously concluded that Wieland's "rheumatologist noted Effexor . . . was probably helping to keep her fibromyalgia symptoms in check." R. 22 (citing Exhibit B4/3; B14F/1). The treatment note cited was authored by Wieland's primary care physician, not her

9

rheumatologist, and was referring to Wieland's improved mental-health symptoms, not her fibromyalgia. *See* R. 386–89, 398–99. Finally, the ALJ's determination that "[r]ecent treatment . . . showed only mild symptoms," R. 22 (citing Exhibit B22F), lacks support in the record. The ALJ cited to an entire 121-page exhibit, which is mostly composed of Wieland's visits with her OB/Gyn and issues related to her pregnancy. *See* R. 1480–1536, 1543–81, 1587–92. When she did check in with her rheumatologist during that time period, treatment notes indicate: "Overall not much has changed. She still struggles with generalized chronic pain worse with activity." R. 1582. That record is not indicative of only mild symptoms.

To be sure, the ALJ also cited several findings during physical examination that were purportedly inconsistent with Wieland's claimed level of impairment. *See* R. 22. The Commissioner is correct that objective evidence is not categorically irrelevant to the evaluation of a fibromyalgia claimant's abilities. Unlike objective medical tests—such as x-ray or an MRI—certain physical exam findings *may* speak to the severity of a claimant's fibromyalgia symptoms, just as a claimant's daily activities and work histories can provide relevant evidence. But here the ALJ here overstated the probative value of such findings. For example, although the ALJ implied that Wieland had no difficulties with tiptoe, heel, or tandem gait or with getting on and off exam tables, these findings were limited to two separate examinations; they were not recurring. *See* R. 656, 996–97. Likewise, while the record shows that Wieland sometimes walked without an assistive device, had normal pulses, and had full range of motion in her major joints, *see* R. 22, 376, 455, 656, 673, 1038, 1072, 1540, 1609, it also reveals edema; tender points in Wieland's neck, back, and knees; limited neck rotation and extension; tenderness in her lower extremities; and at times diminished pulses and decreased range of motion in her spine, *see* R. 376–77, 407, 568, 686, 963, 996–97, 975, 1000–

10

01, 1006, 1010, 1014, 1038, 1056. Because the exam findings were not overwhelmingly inconsistent with Wieland's alleged physical symptoms, and in light of the ALJ's other questionable reasons, these findings are not sufficient to reject Wieland's allegations.

### B. Mental-health symptoms

Wieland also argues that the ALJ erred in evaluating her mental-health symptoms. ECF No. 10 at 6–7. She contends that she began receiving treatment for depression in February 2016 (not September 2016, as the ALJ found) and that the ALJ failed to inquire into her reason for not seeking any mental-health treatment prior to that date. She further contends that the ALJ erred in relying on "unremarkable" mental status examinations, because these one-time, time-limited exams are not necessarily indicative of her ability to function on a daily basis.

The ALJ's evaluation of Wieland's mental-health symptoms is not patently wrong. First, the ALJ's error regarding when Wieland first began receiving treatment for her mental-health impairments (February 2016 rather than September 2016) is harmless. In either case, the ALJ was correct in stating that Wieland did not begin treatment until well after her amended alleged onset date (November 2014). Second, substantial evidence supports the ALJ's finding that Wieland had not sought significant treatment for depression or anxiety. *See* 20 C.F.R. § 404.1529(c)(3) (requiring ALJs to consider what treatments the claimant uses to alleviate her alleged symptoms). Although Wieland claims that the ALJ failed to inquire why this was so, she does not offer any explanation for her lack of treatment during a significant portion of the relevant time period or for her lengthy gap in treatment (September 2016 to February 2018). Third, the ALJ reasonably relied on Wieland's mental-status exams, as she usually presented with a normal mood, affect, attention span, and concentration. *See* R. 23

11

(citing multiple treatment records). It's true that such exams may not always reflect a claimant's functional abilities, but Wieland has not cited *any* positive mental findings on examination. The ALJ did not err in relying on the dearth of such evidence.

## II. Treating source opinions

"For claims filed before March 2017, a treating physician's opinion on the nature and severity of a medical condition is entitled to controlling weight if it is well-supported by medical findings and consistent with substantial evidence in the record." *Johnson v. Berryhill*, 745 F. App'x 247, 250 (7th Cir. 2018) (citing 20 C.F.R. § 404.1527(c)(2); *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016)); *see also* SSR 96-2p, 1996 SSR LEXIS 9, at *1–4 (July 2, 1996). An opinion that is not entitled to controlling weight need not be rejected. Instead, the opinion is entitled to deference, and the ALJ must weigh it using several factors, including the length, nature, and extent of the claimant's relationship with the treating physician; the frequency of examination; whether the opinion is supported by relevant evidence; the opinion's consistency with the record as a whole; and whether the physician is a specialist. *See* 20 C.F.R. § 404.1527(c); *see also Ramos v. Astrue*, 674 F. Supp. 2d 1076, 1087 (E.D. Wis. 2009). Moreover, the ALJ must always give "good reasons" to support the weight he ultimately assigns to the treating physician's opinion. § 404.1527(c)(2); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010).

### A. Physical impairments

Wieland's physical impairments were treated primarily by her rheumatologist, Eric Gowing, M.D., and her primary care physician, Christopher Rocke, D.O. *See* R. 234–35. Dr. Gowing began treating Wieland in December 2006, R. 378; her treatment with Dr. Rocke dates to November 2013, *see* R. 235, 418–23. Both doctors opined that Wieland has work-

12

preclusive limitations stemming from her fibromyalgia and other impairments. *See* R. 378–83, 580–84, 764–67. Specifically, Dr. Gowing opined that Wieland could stand/walk for less than two hours out of an eight-hour workday; could sit for about four hours in a workday; needed to shift positions at will throughout the day; needed frequent unscheduled breaks; would be off task twenty-five percent or more of the workday; and needed to elevate her legs for at least two hours during a typical workday. R. 379–80, 82, 581–83. He further opined that Wieland had significant limitations with reaching, handling, and fingering and that she would be absent from work more than four days per month due to her impairments. R. 382, 583. Dr. Rocke's opinions were substantially similar to Dr. Gowing's. *See* R. 764–67.

The ALJ assigned little weight to Dr. Gowing's and Dr. Rocke's opinions because, in his view, those opinions "are not consistent with the objective or clinical medical evidence of record as a whole." R. 22–23. The ALJ explained that, "[a]side from positive trigger points, there are no objective findings in the record to explain her allegedly severe pain." R. 23. He further explained that Wieland "has . . . never required aggressive treatment like surgery for any of her severe impairments." R. 23.

Wieland argues that the ALJ erred in weighing the opinions of Dr. Gowing and Dr. Rocke. ECF No. 10 at 9–10. The court agrees. Like the ALJ in *Sarchet*, the ALJ here appears to have misunderstood the nature of Wieland's primary impairment, fibromyalgia. The ALJ rejected Dr. Gowing's and Dr. Rocke's opinions because, aside from positive trigger points, the record did not contain objective findings to explain Wieland's alleged pain. But the Seventh Circuit has noted that "[t]here are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are 'pain all over,' fatigue, disturbed sleep, stiffness, and . . . multiple tender spots." *Sarchet*, 78 F.3d at 306. Thus, the absence of objective tests did

13

not support finding Dr. Gowing's and Dr. Rocke's opinions inconsistent with the record.[2] The other purported inconsistency—lack of aggressive treatment—is not logically based on the record. There is no evidence in the record suggesting that fibromyalgia is treatable by surgery, the only "aggressive" treatment method offered by the ALJ when evaluating the opinion evidence in the record. Accordingly, the ALJ failed to provide "good reasons" for rejecting the opinions of Dr. Gowing and Dr. Rocke.

### B. Mental-health impairments

As to her mental-health impairments, Wieland underwent therapy sessions with Catherine Principe, PsyD, and Kelly Schinke, PsyD. *See* R. 234, 1603–06. Wieland had her initial consultation with Dr. Principe in August 2016, *see* R. 586–93; she began seeing Dr. Schinke in February 2018, *see* R. 1606. Both doctors opined that Wieland has work-preclusive mental limitations. Specifically, they opined that Wieland would miss multiple days of work per month due to "bad days"; would require unscheduled breaks throughout the workday; would be off task at least twenty-five percent of the workday; and would be less than fifty percent efficient as an average worker. *See* R. 775–78, 1250–53. The ALJ assigned little weight to Dr. Principe's and Dr. Schinke's opinions, finding them "inconsistent with the relatively unremarkable mental status examinations" and "inconsistent with [Wieland's] reported activities of daily living, such as using a computer, caring for her young son, attending doctors' appointments, and shopping in stores." R. 23.

Wieland argues that the ALJ erred in weighing the opinions of Dr. Principe and Dr. Schinke. ECF No. 10 at 10–12. The court agrees. Although the ALJ reasonably relied on

---

[2] Indeed, Dr. Gowing explicitly noted that, given Wieland's fibromyalgia diagnosis, "[e]xamination findings are not pertinent to [her] ability to work." R. 384.

Wieland's relatively normal functioning during mental-status exams, *see, e.g.*, R. 446, 455, 656, 1078, 1014, his reliance on Wieland's reported activities was misplaced, as he failed to consider limitations Wieland has performing such activities.[3] Wieland reported that she had issues with memory and concentration, had difficulty finishing tasks, needed reminders to take her medications and pay bills online, and didn't have the requisite focus for watching a show or sewing (two of her main hobbies). *See* R. 241–54, 313–26. Likewise, at the hearing, Wieland testified that she sometimes "spaced out" when talking to her teenage son and that she was unable to follow along with a movie. R. 56. The ALJ did not need to discuss or believe all these limitations. But it was error for him to entirely disregard them. *See Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009) ("An ALJ cannot disregard a claimant's limitations in performing household activities.").

## III. RFC assessment

Finally, Wieland argues that her RFC assessment is not supported by substantial evidence because the ALJ failed to account for her need to elevate her legs and her upper extremity limitations. ECF No. 10 at 13–15. "As a general rule, both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014) (citations omitted). Wieland testified she elevates her legs throughout the day to reduce swelling in her legs, frequently drops objects, and has numbness and stabbing pain in her hands, wrists, and fingers. *See* R. 49, 52–53, 58. Likewise, both Dr. Gowing and Dr. Rocke opined that Wieland would need to elevate her legs at or about heart level at least two hours during a typical workday and had significant limitations using her hands, fingers, and arms. R. 380, 382, 583,

---

[3] The Commissioner did not respond to this argument. *See* ECF No. 14 at 20–21.

15

767. The ALJ's errors in evaluating Wieland's subjective physical symptoms and the opinions of Dr. Gowing and Dr. Rocke impacted his RFC assessment, including whether the record supported a limitation for elevating legs and upper extremity limitations. Accordingly, the ALJ shall reevaluate Wieland's RFC after reconsidering these issues.

## CONCLUSION

For all the foregoing reasons, the court finds that the ALJ erred when evaluating Wieland's subjective physical symptoms and the opinions of her treating providers. Based on this record, however, the court cannot determine whether Wieland was disabled during the period between her amended alleged onset date and her date last insured. Accordingly, the court concludes that it is necessary to remand this matter to the Commissioner for reconsideration of the ALJ's RFC assessment and, potentially, her step-four and step-five findings.

The Commissioner's decision is **REVERSED**, and this action is **REMANDED** pursuant to sentence four of section 205(g) of the Social Security Act, 42 U.S.C. §, for further proceedings consistent with this decision. The clerk of court shall enter judgment accordingly.

**SO ORDERED** this 29th day of April, 2020.

_____
STEPHEN C. DRIES
United States Magistrate Judge